## J. T. LOWE *v.* THE STATE.

1. THEFT — INDICTMENT.— Though one who takes up and holds an estray in conformity with the estray laws acquires such a special property in the animal as that an indictment for theft of it may allege the ownership in him, a mere partial compliance with the estray laws, such as preliminary advertisement, manifesting an intention to estray, does not confer either right of possession or special property, and an indictment that alleges the ownership in an unknown person is sufficient.

2. CONTINUANCE.— Application for a continuance was filed on September 19th, and recited the presence under subpœna of the witness at the previous term of court and his subsequent temporary departure from the State, and alleged that on the 13th of September defendant "asked" for an attachment for the witness. *Held,* that a total want of diligence is manifest, and the continuance was properly refused.

3. CHARGE OF THE COURT — PRACTICE.— Even if tenable under any circumstances, the objection that the charge of the court was not filed until the day after it was read to the jury, comes too late when made for the first time in this court.

4. SAME.— The indictment charged the defendant and Wm. Lowe jointly, and the caption of the charge so stated the case, but the first paragraph announced to the jury the severance of the two, and the separate trial of the defendant. *Held,* that the charge so stating the case raises no presumption that it was prepared for or given in a case other than that on trial. And if it had been, and was applicable to the case on trial, the fact that it had been used in another case would not be ground for new trial.

5. EVIDENCE.— See evidence held sufficient to sustain a conviction for theft of cattle.

APPEAL from the District Court of Ellis. Tried below before the Hon. G. N. ALDREDGE.

The indictment charged the defendant and William Lowe jointly with the theft of two cows, one steer and one calf, estrays, and the property of some person unknown. Upon a severance the defendant was tried, found guilty, and awarded a three years' term in the penitentiary.

The witness Wm. Finlay, testifying for the State, stated

in substance that on the 22d and 27th days of February, 1880, he posted notices of the presence of estray cattle on his premises, and of his intention to deal with them as authorized by law unless claimed within twenty days. That about the last of February a man who announced his name as Jackson called on him and told him that he had been to Waxahatchie and there ascertained that witness had posted some cattle which he, Jackson, had lost from a drove some time before, describing them accurately. Upon Jackson's swearing to the cattle, the witness, upon the advice of his brother, delivered them to him. About this time the defendant and another man rode up, and asked if witness had cattle for sale. The witness sold him a small steer, and told him that Jackson would probably sell the cattle turned over to him by the witness. The witness introduced the defendant and Jackson, and they traded, the defendant paying Jackson fifty-seven dollars, but taking no bill of sale. Jackson was riding a fine bay stallion or ridgeling, defendant a bay pony, and the man with defendant a dun or yellow horse. About a month afterwards, the witness at the Mansfield mill saw the bay stallion Jackson rode and the dun horse ridden by the defendant's companion on the occasion referred to; they were hitched to a wagon, which circumstance excited his suspicions. He found the owner of the wagon and addressed him as Jackson, but he turned and left the witness, who soon ascertained that his name was not Jackson, but was Wm. Lowe, a brother of the defendant. The witness watched the wagon until near night, but failed to see the man Jackson again. He then wrote on a piece of paste board, addressed to Jackson, *alias* Wm. Lowe, Jr., directions to return a certain bunch of cattle which he and defendant "fraudulently took," etc., in order to save trouble, and threw the paste board in the wagon. The witness identified Wm. Lowe as the man Jackson, and defendant as J. T. Lowe who

got the cattle. The appearance of Wm. Lowe at the last term of the court was much changed from his appearance when he personated Jackson to get the cattle, and when the witness saw him at the mill. His whiskers and mustache, which were sandy when he got the cattle, and when he was seen at the mill, were dyed black, and he was well dressed in a black suit at the last term of court.

Robert Finlay, a brother of the prosecuting witness, was present during the transactions attending the delivery of the cattle to the assumed Jackson, and his sale of the same to defendant, and with regard to those transactions testified in substance as the prosecuting witness. He would not swear positively that Wm. Lowe and Jackson were one and the same person, but believed them to be.

The testimony of the prosecuting witness showed, also, that about the close of the trade between defendant and Jackson, and after the latter had gone, Joe Bell rode up to the party and asked defendant what he and his companion, one Marks, were doing with the cattle, and that defendant said he had just bought them of a man named Jackson; that Bell asked if he took a bill of sale, and he replied no, that during his life he had never taken or given but one bill of sale. This evidence Bell corroborated. He testified, further, that on the day before these assurances and the alleged purchase, he saw the defendant on a bay horse, and the man Marks on a sorrel horse, riding around among his, witness's, cattle, and Wm. Finlay's and the stray cattle mentioned in the indictment. After examining the cattle for a time, the defendant and Marks rode up to the witness's house, asked about the cattle, whose they were, etc. Witness told them some were his, some were Wm. Finlay's, and that the bunch of muley animals were estrays which had been posted by Wm. Finlay. They again rode out to the bunch and critically examined them. Next morning, about 10 or 11

o'clock, the same two men, riding the same horses, rode up to witness's house and asked him if he had cattle to sell. Receiving a negative answer they rode on to Wm. Finlay's. The witness followed shortly, and found them with the bunch of cattle.

Another witness testified to having seen the defendant in possession of the cattle described, and still another testified that, being asked what he intended to do about this prosecution, the defendant replied that if he could get Wm. Lowe to go with him, he would leave and go to Montana Territory.

For the defense, Wm. Perry testified that on the day of the alleged theft, February 23d, he accompanied the defendant and Marks to hunt a cow of his which he proposed to sell defendant; that not finding the cow, he made a bill of sale conveying the cow to defendant, and received pay therefor. Wm. Lowe did not accompany them, but staid at Lowe's house, where he was when the witness returned at eleven o'clock.

A. M. Marks testified to the same fact as testified by Perry, and further, that after leaving Perry they, witness and defendant, went to Wm. Finlay's, and after defendant bought a steer from Finlay, the latter introduced him, defendant, to a man named Jackson, from whom defendant bought the cattle in question, paying Jackson $57 therefor. The bay colt defendant had was the only stallion owned by any of the family, was only two years old and was not broken to harness. The horse ridden by witness (the dun or sorrel) would not work in harness.

Other members of the family testified that the only stallion owned by defendant was a two-year old, unbroken to harness, and that Wm. Lowe did not leave the home-place on February 23d.

*Anderson & Price*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J.   The indictment charged that the stolen animals were estray cattle, that they were taken from the possession of the owner, and that the owner was to the grand jury unknown.   This allegation, it is insisted, is not only not sustained, but is directly and positively contradicted by the evidence.   Wm. Finley, a principal witness for the State, testified that on the 27th of February, 1880, he posted notices of his intention to estray the animals if not taken away from his premises within twenty days from date; one of which notices he filed in the clerk's office as required by law.   He says: "I had taken no further steps towards estraying the cattle.   It was in a few days after this posting that defendant got the cattle."

It is here contended by appellant that this posting of the animals with a view of estraying them gave Finley not only a special ownership in them, but also placed the animals actually in his possession; that the indictment should have alleged the ownership and possession in him and not the unknown owner; and that, such being the state of the proof, the allegations in the indictment were not only unsustained but disproved, and the conviction consequently illegal.   Our statute provides that "when one person owns the property, and another person has the possession, charge or control of the same, the ownership may be alleged to be in either."   Code Crim. Proc. art. 426.

Under the evidence stated above two questions suggest themselves: 1. Was Finley in contemplation of law the owner of the animals? and 2dly, if not, was his right to possession such as that it was essential that the indictment should charge its violation?   A proper solution of these questions will settle the supposed conflict between the indictment and proofs in the case.

Appellant's counsel rely upon *Jinks* v. *State*, wherein this court say, "from the time Rattan estrayed the property up to the date of sale under the stray laws, he was

holding the property for the owner, and subject to reclamation by him on proper proof; and from the date of sale he, being the purchaser, became the owner of the property himself. In either event his possession was legal, and the law protected his possession against all persons except the rightful owner, to the time of the stray sale; and having such legal possession it was proper to allege in the indictment that he was the owner of the property." 5 Texas Ct. App. 68. The same principle was announced in *Cox* v. *State*, 43 Texas, 101. But in each of these cases the action taken by the estrayer in compliance with the estray laws had been such and had gone to that extent that the parties in law were entitled to an interest in, as well as possession of, the animals to the extent at least to which the fees paid out by them might be a lien upon the animal and a legitimate claim against the rightful owner.

But in the case before us Finley had simply posted his notices and filed one of them with the clerk as his declaration of intent to estray the animals if no owner applied for them within twenty days. Rev. Stats. art. 4570. This amounted to no more than an initiatory step indicating an intention to estray the animals; in no other manner had he attempted to comply with the law regulating estrays. There had been no oath, appraisement or bond, the essential prerequisites to the estrayal. Rev. Stats. art. 4571. Without a bond such as the law demanded, he could not have used the animal taken up as estray, for any purpose, because the statute expressly prohibits such use [Rev. Stats. art. 4575], and, furthermore, subjects him to a criminal prosecution and punishment for such illegal use. Penal Code, arts. 770 and 771. In our construction of the law applied to the facts Finley was neither the owner of the animals nor in possession of them. They were estrays whose owner was unknown, as was charged in the indictment.

The application for a continuance did not state facts sufficient to excuse the apparent want of diligence to secure the attendance of the witness Berry. He had been served with subpœna, and was in attendance at the February term. The application was made on the 19th of September, 1881. Affiant states "that, on Tuesday, the 13th day of September, he asked for an attachment for said witness, but was informed that he was now temporarily absent from the State." Learning him to be absent from the State on the 13th, defendant did not even then do more than "ask for an attachment." He did not have it issued and placed in the hands of the proper officer in order that it might be shown whether his information to the effect "that he was now temporarily absent from the State" was correct or not. The statement is vague and indefinite in itself. Who informed defendant that Berry had left Ellis county? And when did Berry leave? And what were the circumstances which excused or prevented defendant and his counsel from finding out that so important a witness as this Mr. Berry was absent from the State and would not in all likelihood appear and testify for him on his trial? The session of the court commenced on the 5th day of September, and defendant in the exercise of proper diligence should have been inquiring for his absent witnesses then. He does not do so until the 13th, when, not seeing Berry about the court, it occurs to him that he will "ask for an attachment;" which he does, when he is informed by the clerk or sheriff or some one else, we are not told whom, that Berry is absent and in the State of Illinois. How is it that other parties can so readily inform him of the whereabouts of his witness and he, the one of all others most deeply interested in his whereabouts, know nothing of him? These are questions which most naturally suggest themselves,— which certainly were capable of explanation,— and which defendant does not attempt to explain.

His failure to explain them was doubtless the cause inducing the court to overrule his application for continuance, and in view of them we cannot say that the court erred in the ruling.

With regard to the filing of the charge of the court to the jury, it is provided by statute that "the general charge given by the court, as well as those given and refused at the request of either party, shall be certified by the judge and filed among the papers in the cause; and shall constitute a part of the record of the cause." Code Crim. Proc. 597.  This statute has always been held mandatory to the extent that the filing was essential to the proper authentication of the charge as a record paper in the cause when the record was to be sent up on appeal to this court, for revision; and that, unless it bore the file-mark of the clerk, this court would not consider it as a paper properly belonging to nor constituting part of the record.  *Richarte* v. *State*, 5 Texas Ct. App. 359, and authorities cited.  But it is only where there appears to be a purported charge which shows affirmatively never to have been filed, that the want of file-marks would invalidate the paper.  And it is true that this court has time and again recommended as the proper practice that, after reading his charge, the judge should hand it to the clerk that it may be filed by him before being handed to the jury.  *Krebs* v. *State*, 3 Texas Ct. App. 348.  We still insist that this is the proper practice and would avoid all such unnecessary and oftentimes fatal objections of this character.

But in the case before us the objection is not that the charge was not filed at all, but that it was filed the day after it was read to the jury.  It is not denied that this paper is the charge as actually read by the judge, and it is signed officially by the judge.  No objection was urged to the time and manner of filing, in the court below, and it is submitted for the first time on this appeal in this

court. If the objection were at all tenable under any circumstances, it comes too late as here presented. In so important a record paper as the indictment, our Supreme Court, in *Terrell* v. *State*, 41 Texas, 463, held that "if an indictment be found and returned by the grand jury in the District Court, and then filed by the clerk, its validity is not affected by a mistake made by the clerk in the date of his entry in indorsing upon it the date of the filing. Such mistake could not avail to sustain a motion in arrest of judgment." In this case we find a file-mark upon the charge, and in the absence of any direct showing to the contrary we will presume a *lapsus pennæ* or mistake on the part of the clerk in his indorsement of the date, rather than an omission of duty on the part of the judge and the clerk.

Another objection to the charge, urged in connection with the above, is that J. T. Lowe was alone on trial, whereas the charge states the case as being The State of Texas *v.* J. T. Lowe and Wm. Lowe, and therefore must have been prepared and given in a different case than the one on trial. But we find that the indictment was against J. T. Lowe and Wm. Lowe jointly; the number of the case is the same as the one appearing in the charge, and in the first paragraph of the charge the court announces that "the defendants herein have severed and J. T. Lowe is alone on trial." In *Austin* v. *State*, 42 Texas, 355, where a similar question to the one here suggested was passed upon by the Supreme Court, it was held that "the fact that the charge read to the jury on the trial of a criminal case bore the style and file-mark of another criminal cause raises no presumption that it had been used on the trial of another party, nor, if applicable to the case, would the fact that it had been so used be a ground for new trial." As we have seen, however, the style of the cause as stated in the charge in this case was explicitly correct, and, when considered in connection with the

first paragraph above noticed and the other portions of the record, could not mislead, or by any possibility create the slightest doubt or confusion with regard to the cause upon the trial of which it was used.

As to the evidence, the sufficiency of which is questioned, it may be admitted that there is a conflict, but yet, if the jury believed the State's chief witness,—and it was their peculiar province to pass upon his credibility,— the facts deposed to by him were amply conclusive of defendant's guilt.　We will not interfere with a verdict simply because the evidence is conflicting.　The able argument and briefs of counsel are quite persuasive as well as plausible, but we cannot divest ourselves of the conviction impressed upon us by a most careful consideration of the record that it presents a trial eminently fair and impartial, in which no error was committed requiring a reversal.　The judgment is therefore affirmed.

*Affirmed.*